**RUTLEDGE v. UNITED STATES et al.**

Civ. No. 2020.

District Court, W. D. Louisiana, Monroe Division.

July 2, 1947.

J. Norman Coon and Howell H. Heard, both of Monroe, for plaintiff.

Malcolm E. Lafargue, U. S. Atty., of Shreveport, La., for the United States.

A. Milling Bernstein, of Monroe, La., for Mrs. Mitchell.

DAWKINS, District Judge.

This is a contest between the widow and mother of a deceased soldier over the proceeds of a policy of National Service Insurance upon his life.

Most of the facts are not disputed and are as follows:

Wayne T. Hardwick while in training as a cadet in the air service, on December 2, 1942, took out a policy of National Service Insurance on his life in favor of his mother, Mrs. Katie Jane Mitchell, for the maximum amount of $10,000. He was graduated from Selman Navigation School near Monroe, Louisiana, on October 16, 1943, commissioned as a second lieutenant, and on the same day married Juanita Peacock. After the marriage the Lieutenant informed his bride, according to her testimony, that, "he had a policy made out to his mother but since we were married he was taking a policy out in my name."

The day following the marriage the young couple went to Sipe Springs, Texas, the former home of the deceased, to visit his mother and stepfather, where they spent about a week. Thereafter, he was sent to various training fields, accompanied by his wife, but towards the latter part of January, 1944, was informed he would be sent overseas for combat duty. Shortly before returning to Ardmore, Oklahoma, and going from there to Grand Isle, Nebraska, for final processing, he, with his wife, again visited his home at Sipe Springs, Texas, for about five days, at the end of which visit she returned to her home in West Monroe, Louisiana, to stay with her parents, and he went to Ardmore, Okla., from which point he was transferred to Grand Isle, Neb., for final preparation for overseas duty. While in Sipe Springs certain things transpired with regard to the insurance; and the testimony of the wife

or plaintiff and that of the mother, the individual defendant, constitutes the only real conflict in the evidence. The wife says: "He was going through some papers and came across this policy (the one made in favor of his mother) and he said, 'Mother, throw this away because it isn't worth the paper it is written on; I have made out my insurance to Juanita because she is expecting a child and needs it and I have had it issued to her."

The mother's story of what happened was: "I had that paper (meaning the policy) and I asked him, I said, 'You have a wife and you know you took out the $10,000 insurance made out to me, making me your beneficiary, what are you going to do about it? He said, 'Mother, you are not to worry over that; you will get yours, and she will get hers. I have that fixed' ".

The mother's statement was made when she was called on cross-examination by the plaintiff. Later, when the plaintiff had rested, and while testifying on direct examination by her own counsel, she gave substantially the same testimony, with this addition: "I says 'but you know I have this paper', he says, 'that is O. K. It is just a piece of paper.' "

While being processed for overseas duty, towards the end of January and first days of February 1944, according to a brother officer, Lieutenant Ryan J. Lancaster, who was also processed for overseas duty at the same time, and continued in the organization with Hardwick until the latter was killed in a mission over Germany on the 19th day of May, 1944, they were furnished by a clerk at Grand Isle, Nebraska, whose duty it was to look after the personal affairs of those going overseas, certain forms including one with respect to National Service Insurance, which they filled out, and copies thereof were mailed by the Army to their wives. In the course of his examination, Lancaster was interrogated and answered with respect to the insurance of his brother officer as follows:

"Q. Were you present with Lt. Hardwick at the time when he did anything about his insurance with the United States Government? A. Yes, I was with Lt. Hardwick at Grand Island, Nebraska, on February 3, 1944, when we both went to be processed. At that time, we were to fill out insurance forms in which our beneficiaries were named, to receive $10,000.00 in case of our death. At that time, Lt. Hardwick before me, named his wife, Juanita Joy Hardwick, as beneficiary to $10,000.00 insurance.

"Q. How did he name her, on paper or orally? A. It was on paper, on the Government Insurance Form—the same one I wrote on.

"Q. Did you at that time, designate your wife as beneficiary? A. Yes.

"Q. You had insurance before that in your wife's favor? A. Yes.

"Q. Before whom, did this signing or designating on paper, the insurance notation take place, before whom? A. Before a Clerk in the office of the Insurance Department. He told us————(objected to by Mr. Chandler as hearsay.)

"Q. Who do you mean by the remark 'He'? A. The clerk of the office.

"Q. I am going to ask that Mr. Lancaster state or answer that, subject to the objection. A. The clerk told us when we signed these forms, that our wives as beneficiaries to $10,000.00 insurance, would be notified from Grand Island, Nebraska, the branch of the National Life Insurance.

"Q. Did you see the Pay Data Card at that time of Lt. Hardwick? A. Yes, at that time his Pay Data Card read that he paid his insurance in the amount of $6.50 per month. I remember that, because mine was $6.60 and I was a year older than he—therefore, my insurance was 10¢ higher.

"Q. After that processing, where did you go? A. After we were processed we left for overseas. We left Grand Island, Nebraska, February 7, 1944.

"Q. Did you have any conversations with Lt. Hardwick after processing about his insurance? (Objected to by Mr. Chandler as hearsay.)

"Q. Let him answer, subject to the objections. A. Yes, I did. Lt. Hardwick stated at one time that before his marriage to Juanita Joy Peacock, that he had his government insurance in his mother's name, and now he had changed the beneficiary to his wife, Juanita Joy Hardwick.

"Q. Now, do you remember any particular place you were, when he said that? When he told you he had changed his beneficiary? A. He told me that before we left Grand Island, Nebraska.

"Q. After you saw him change it on the form you testified about? A. Well, as far as changing anything, I can't say he changed the beneficiary at that time: but, his wife's name was on the Form as beneficiary to his insurance.

"Q. Do you recall at the Air Base in England, anything having been said? (Objected to by Mr. Chandler as hearsay.) A. Yes, at our Air Base in England, Clydesdale, one evening we were sitting around the fire, and about ten flyers failed to return on a day's mission. Lt. Hardwick, as well as myself, remembered that our wives were covered by our insurance in case we did not return some day.

"Q. Did he make that statement in your hearing? A. Yes."

The witness, in response to questions, described in detail how the processing took place, and disclosed that he and Hardwick remained together throughout their visits to several stations, but said also that he received his copy of the document in which he designated his wife as beneficiary to his $10,000.00 National Service Insurance and kept it in his file with him when he went overseas; and that another copy was sent by the Army to his wife, who received it.

On cross-examination, the witness was asked and answered questions as follows:

"Q. Did you actually see the paper that Lt. Hardwick signed? A. Yes, we both signed together. The Sergeant handed out three or four together. He borrowed my fountain pen because it had to be filled out in ink. While waiting for him, he signed her name.

"Q. Did his blank also ask what insurance he had? A. No.

"Q. Did it ask where his papers were kept? A. No.

"Q. Did it ask that on the blank you signed? A. No.

"Q. You do not know who was the beneficiary of his insurance at that time? A. No.

"Q. And, you do not know whether he made any change of beneficiary at that time? A. No, I can not say he changed beneficiary at that time.

"Q. You do not know that he did? A. He could have changed it at any other station, I do not know.

"Q. This processing was required when you left any station? Before you went to Grand Island, did you go through the same thing at that time? A. Yes, on a small scale.

"Q. It was required at every change from field to field, by army regulations? A. Yes.

"Q. What sort of a notice did your wife get, after you were processed at Grand Island? A. The notice was a card or form showing that she was the beneficiary.

"Q. She had already been the beneficiary? A. Yes.

"Q. There was no change? A. No."

Plaintiff received through the mail from Grand Island, Nebraska, an envelope, which showed it had been mailed there on February 4, 1944, and in the upper left hand corner of which appeared "War Department, Combat Crew H. Q., Army Air Base, Grand Island, Neb.", containing the following document:

"Army Air Base,
Grand Island, Nebraska.
Date 2–3–44

Luna Star Route
(Name of Beneficiary)       (Street Address)
West Monroe, La.
(City, State).
(Fill in appropriate paragraph)

1. During my stay at this station, the advantages of taking out the maximum amount of life insurance made available by the Government ($10,000) have been fully explained to me. However, I have decided:

a. To increase my (National Service Life Insurance) (United States Government Insurance) from the present figure of $——— to $———. To cover cost of this insurance, I have authorized the deduction of $——— from my monthly pay.

b. To take out (National Service Life Insurance) (United States Government In-

surance) to the amount of $————, which is $———— less than the maximum amount of $10,000 I am privileged to carry. To cover payment of premiums on this insurance, I have authorized the deduction of $———— from my monthly pay.

2. On date of Oct. 16, 1943, I took out $10,000 in (National Service Life Insurance) (United States Government Insurance), naming you as my beneficiary. To cover the cost of this insurance, I have authorized a monthly deduction from my pay of $6.50.

From Wayne T. Hardwick

Rank 2nd Lt.

Army Serial Number 0–814304

21st Bomb.Wing Form 21–P–1a 8–9–3”

She also received what purported to be her husband's last will and testament, which is likewise quoted as follows:

"I, Wayne T. Hardwick of Sipe Springs, Texas, being of sound and disposing mind, memory and understanding, do make, publish and declare this instrument in writing as and for my last will and testament, hereby expressly revoking any and all former wills and codicils by me at any time heretofore made or published.

"First, It is my desire and I hereby direct that my Executor/trix hereinafter named, pay off and discharge all of my just debts as soon after my decease as may be practicable.

"Second, All the rest, residue and remainder of my estate of every kind and description, real, personal and mixed, howsoever and wheresoever the same may be situated, now owned or that which may hereafter be acquired by me, I give, devise and bequeath unto Juanita Joy Hardwick (wife), Luna Star Route, West Monroe, La.

"Lastly, I hereby nominate, constitute and appoint Juanita J. Hardwick Executor/trix of this my last will and testament, to serve without bond or surety.

"Witness my hand and seal this 10 day of Jan. 1944.

Wayne T. Hardwick (Seal).

"Signed, Sealed, Published and Declared by the said Testator Wayne T. Hardwick as and for his last will and testament in the presence of us, who at his request, in his presence, and in the presence of each other have hereunto subscribed our names as attestating witnesses, this 10 day of Jan. 1944, at Ardmore A. B. Oklahoma."

The document was a typed or mimeographed form in which the name and address of the testator, the name and address of the legatee, the date, space for signature, etc, were blanks, and the plaintiff swore that all of these were filled in in the handwriting of her husband. The names of the attesting witnesses were also written in with pen and ink.

On February 22, 1944, deceased wrote and mailed to his wife from his station in England a letter in which he referred to the insurance as follows:

"Say, Darling, did you ever get your papers for my life insurance? You should have gotten it before now."

The above constitutes the material evidence in the case.

■ ■ It is apparent that the deceased, when he went overseas, believed he had made provision for the protection of his wife and unborn child to the extent of $10,000 National Service Insurance. The fact remains that the certificate as issued on December 2, 1942, designated the mother as beneficiary. The burden was upon the wife to show by a fair preponderance of the evidence that the deceased took affirmative steps to either have the certificate in favor of his mother cancelled and another issued in favor of the wife, or changed the beneficiary to his wife. The testimony of the wife tends to show that on the day they were married deceased went to what he considered the proper agency at Selman Field to have insurance provided for her in the sum of $10,000. We have no information as to whom he saw or what was done. He actually believed he had succeeded. The document, Exhibit P-1, quoted above, confirms and corroborates the statement of his wife. It must be assumed that the deceased knew, or at least the law presumes that he, along

with all others, was aware that not more than $10,000 of such insurance was available to any one soldier and that it was his privilege to name as a beneficiary any one within the permissible class, which, of course, included his mother and wife. The deceased knew that he had already taken and there had been deducted out of his pay as a soldier the premiums upon the $10,000 insurance, in which his mother was named as beneficiary. It must be likewise assumed that when he applied to the branch or agency of the Air Training Corps at Selman Field that he was advised that the only way that he could provide for his wife, with the maximum already issued in favor of his mother, was to cancel it and obtain a new policy, if that was legally possible, or to change the beneficiary. This court is not in possession of the rules covering a change of the beneficiary in a National Service Certificate, that is, whether, as in the case of an ordinary life insurance policy, the change has to be noted on the document itself, or if it is accomplished by the issuance of some other document. In any event, no record has been found of anything done at Selman Field, nor has the original of Exhibit P-1, signed on February 3d, at Grand Island, Nebraska, been found among any records of the War Department, although the official envelope addressed to the wife and bearing the postoffice stamp at that point on the next day, February 4th, shows beyond question that it was filled in and signed by the deceased there and was mailed by his command, to the wife. The latter identified the signature thereto as that of her deceased husband. This form had two subsections (a) and (b), to paragraph I, (a) was to be filled in if the soldier wished "to increase" the amount of his insurance within the maximum, if less than $10,000; and (b) was to be used "to take out * * * less than the maximum amount of $10,000, I am privileged to carry." If he did not already know it, this placed before his eyes at the time of the execution of this document the statement that $10,000 was the maximum amount he was "privileged to carry". However, deceased struck out both the subparagraphs (a) and (b). Paragraph 2 was to be used if he already had

insurance in the maximum amount of $10,000. At the top he filled in the name of his wife as the person to whom it was addressed and under which appeared the words "name of beneficiary, address, etc." Paragraph 2, as he filled it in, declares in unequivocal terms that "on October 16, 1943, I took out $10,000 National Life Insurance * * * naming you (the addressee) as my beneficiary." Nowhere in this document or in the statement to his wife on the day of their marriage did he use the word "change" or "change of beneficiary." On the other hand, according to the testimony of both his wife, the plaintiff, and his mother, the subject of protecting his wife, in view of the marriage and her known pregnancy, was brought up and discussed on the occasion of the last visit to his mother's home in January 1944, before going overseas. Each say that he assured them that the wife had been provided for but the latter insists that he told the mother that the certificate which she had was of no value because he had taken out insurance in favor of his wife, while the mother claims he assured her that both would "get theirs". Notwithstanding this insistence by the mother, in direct examination by her counsel, in quoting the conversation with her son, she said, "but you know I have this piece of paper?" and his reply was "That is O. K. It is just a piece of paper." It is a little difficult to reconcile this with her insistence that she was to keep the certificate as in full force. It tends to corroborate the wife's testimony that deceased told his mother it was worthless. Still later, in her direct testimony, the mother was asked by her counsel and replied:

"Q. Did he ever intimate to you that he had made a change in beneficiaries from his mother to his wife? A. No, Sir, he just said, 'I have got it fixed.'

"Q. "Did he ever intimate or state that he was going to or intended to make such a change? A. Not to me. She said he had to her."

The only time that he said anything about having changed his insurance from his mother to his wife was to his brother officer, Lieutenant Lancaster. As appears from the testimony quoted above, both he

and the deceased went to fill out the forms furnished "in which our beneficiaries were named to receive $10,000 in case of death. At that time Lieutenant Hardwick, before me, named his wife, Juanita Joy Hardwick as beneficiary of $10,000 insurance." This statement is, of course, supported by the filled out form received by his wife, referred to above. The witness also said that the Clerk who furnished the forms, which they filled out, told them that "our wives as beneficiaries to $10,000 would be notified from Grand Island, Nebraska, the branch of the National Life Insurance".

Lancaster likewise testified, in answer to a question by plaintiff's counsel, as follows:

"Q. "Did you have any conversation with Lieutenant Hardwick after processing about his insurance? A. Yes, I did. Lieutenant Hardwick stated, that at one time, before his marriage to Juanita Joy Peacock, he had his government insurance in his mother's name, and now he had changed the beneficiary to his wife, Juanita Joy Hardwick."

If the deceased did go to the Government Agency at Selman Field in Monroe after his marriage on October 16, 1943, and asked to have his beneficiary changed, the only evidence to support such action is that referred to and quoted above. No record of either request or a change has been found among the files of the War Department. However, the absence of such records does not, of itself, suffice to defeat the soldier's efforts if it has been shown by a fair preponderance of the evidence that he intended to make the change and took affirmative action to bring this about. Deceased was a youth from a farming community, born January 22, 1922, entered the service at the age of 18, signed the application for the insurance in favor of his mother on December 3, 1942, about a month and a half before his 21st birthday and at the time of entering the Army Air Force Classification Center at Nashville, Tenn. At the time he carried no other life insurance and at no time did he make any allotment to his mother. He left high school to enter the army, and perhaps, like thousands of others, had never thought of taking life insurance or was able to do so,

and therefore knew very little or nothing about such matters. At the time of his processing for overseas duty in January and early in February 1944 we were sending men, particularly those in the air forces, overseas to England and elsewhere by the thousands in preparation for D-Day, which came on June 6th of that year. It is easy to understand the confusion and probability of mistakes, omissions, and misplacing of documents and records in such circumstances. The plaintiff has shown by the best available evidence, both written and documentary, that the deceased intended, and went overseas, with the belief that he had protected his wife and unborn child with $10,000 of government insurance. He evidently thought that he had done everything necessary to accomplish this, as indicated by the inquiry quoted above from a letter written to his wife from an undisclosed base on Washington's birthday. The desire of deceased that his wife, in case of death should receive all that he possessed is shown by the unprobated will which he signed at Ardmore, Oklahoma, January 10, 1944, naming her as his executrix and also quoted above.

It is true that if his mother had remained the beneficiary in the certificate for $10,000, its proceeds would not have been part of his estate, subject to transfer under the law, by will, but this document, which was evidently also prepared for him in the course of his processing, is further written proof of his desire and intention that his wife should be protected. Knowing as he did, the insurance was the only thing of value that he possessed, the execution of the will, no doubt, gave him a further feeling of assurance that his purpose had been accomplished.

■ It is the duty of the courts to give effect to the wishes and intentions of the men in the service, if it is reasonably possible to ascertain them from the available evidence, which they leave behind when giving their lives in defense of their country. It is not required that the rigid forms of ordinary life insurance be followed but sufficient if the intention is made certain and affirmative action taken to express it. Citron v. United States, D.C., 69 F.Supp.

830; Walker v. United States, D.C., 70 F. Supp. 422; Van Doren v. United States, D.C., 68 F.Supp. 222; Roberts v. United States, 4 Cir., 157 F.2d 906; Peart v. Chaze, D.C., 13 F.2d 908.

It is believed that the proof in this case is sufficient to show that deceased intended to change the beneficiary of his insurance from his mother to his wife; and that he made this known in a manner which entitles her to the proceeds.

There should be judgment for the plaintiff.

Proper decree should be presented.